TEXAS CENT. R. CO. v. ROSE. (No. 7224.)

(Court of Civil Appeals of Texas. Dallas. Dec. 19, 1914. Rehearing Denied Jan. 23, 1915.)

1. CARRIERS (§ 366*) — PASSENGERS — EJECTMENT OF INTOXICATED PASSENGER—LIABILITY.

Where plaintiff, at the time of his ejection from defendant's train, was mentally and physically incapacitated from caring for and protecting himself from danger, defendant's liability for consequent injury depended upon whether the place where plaintiff was ejected was such a place as a prudent person would have considered safe under the circumstances.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1454; Dec. Dig. § 366.*]

2. CARRIERS (§ 366*)—EJECTION OF PASSENGER—NEGLIGENCE—LIABILITY.

Where an intoxicated passenger was incapacitated to take care of himself, as known to defendant's conductor, when ejected from the train at an intermediate station, at a place which was unsafe and where no prudent person would have left him under the circumstances, it was negligence, and where as a proximate result thereof he was later run over by another train, the defendant was liable.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1454; Dec. Dig. § 366.*]

3. APPEAL AND ERROR (§ 1004*)—REVIEW—AMOUNT OF DAMAGES.

A verdict for $15,000 for personal injuries, which the trial judge by refusing to grant a new trial approved, and as to which there was no evidence of passion or prejudice on the part of the jury, will not be disturbed.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3944-3947; Dec. Dig. § 1004.*]

Appeal from District Court, Hill County; Horton B. Porter, Judge.

---

Action by Charlie Rose against the Texas Central Railroad Company. Judgment for plaintiff, and defendant appeals. Affirmed.

See, also, 161 S. W. 387.

Chas. C. Huff and A. H. McKnight, both of Dallas, and Spell & Sanford, of Waco, for appellant. Walter Collins and Shurtleff & Cummings, all of Hillsboro, for appellee.

RAINEY, C. J. Appellee sued appellant to recover damages for the loss of a leg caused by the negligence of the appellant.

"Appellee alleged that he went to Waco, where by the use of intoxicating liquors he became so intoxicated that he was 'mentally and physically incapable of protecting himself from danger or of appreciating danger or of knowing and understanding the nature and consequence of his acts'; that while in this condition he boarded one of appellant's passenger trains for Aquilla, Tex., having a ticket from Waco to that point; that he was ejected from the train at Tokio, a station between Waco and Aquilla, being at the time of his ejection in the aforesaid intoxicated condition; that the employés who ejected him knew of his condition at the time; that he was ejected at an improper place; that later he was run over by one of appellant's trains, and his leg was so badly mashed and mangled that it had to be amputated between the ankle and the knee; that it was negligence on the part of appellant to require him to leave the train at such place in his then condition, the employés knowing the condition; and that as a direct and proximate result of such negligence his injury was sustained. Appellant denied the principal allegations, and specially averred that, while appellee was intoxicated, his intoxication did not go to the extent claimed, and that he was physically and mentally capable of taking care of himself. It also averred that he was ejected from the train because he presented no ticket to the conductor and said he had no money with which to pay fare, and therefore the ejectment was proper. In addition to this, it specially alleged that Tokio was a regular station on its line, that it was a proper place at which to discharge appellee, and that the injuries sustained were not the proximate result of any negligence on its part."

A trial resulted in a verdict and judgment for appellee for $15,000, from which appellant prosecutes this appeal.

Appellant complains of the court for refusing to instruct the jury to return a verdict for it. The contention is that:

"Appellee having advised its conductor when requesting his fare that he had no ticket and no money, appellant had the right to eject him from the train, although he was intoxicated."

The evidence shows that when the conductor approached appellee and requested his fare the appellee replied that he had no ticket and no money. If the case rested alone on this evidence, appellee was lawfully ejected, and the peremptory charge should have been given, as appellee had no right to recover. But this is not all of the evidence which presents another phase of the case. The appellee alleged that he was in an intoxicated condition, which was known to the employés of appellant, and that he was ejected at an improper place. Appellee, being at Waco at 10 o'clock at night, bought a ticket over appellant's line for the station of

Aquilla; he took passage on appellant's passenger train leaving Waco at 10 o'clock at night for Aquilla. He was intoxicated, some of the witnesses pronounced him drunk. Appellee says he was drunk and remembered nothing about the accident. The conductor testified:

"I was conductor on the train running from Waco to Whitney on September 14, 1912. The train on which I was conductor left Waco at 10 p. m. September 14, 1912. I was working my train, and on stepping out of the door onto the platform, at the rear of the chair car, the porter on the Pullman car pointed to a young man sitting on the platform of the chair car with his feet resting on the steps of the chair car. His head was turned westward, which was toward the steps of the car. With reference as to whether I saw Charlie Rose before he boarded my train, I will state that I did not see him that I remember of. I did not recognize the young man on the steps as any one whom I had seen before. The Pullman porter first called my attention to him sitting on the platform of the chair car. I got him by the arm and said: 'Young man, get up; let's see what you have got.' He got up very readily. I asked him if he had a ticket, and he felt in his pockets and said: 'No; I ain't got no ticket.' I asked him then, if he had any money, and then he felt in his pockets and replied; 'No; I ain't got nothing.' I asked him where he wanted to go, and he replied, 'I want to go to Waco.' I told him that we had just left Waco, and he remarked that he wanted to go to Waco. I told the Pullman porter, Shorty, to watch him until I got through working the train. I worked on through the train, and when I returned the young man had again sat down on the rear platform of the chair car. I asked him for his ticket, and he went through his pockets and said, 'I got nothing.' I asked him if he had any money. He again felt in his pocket, and said, 'I ain't got nothing.' I then said, 'I will have to let you off at Tokio,' and he said, 'All right.' I did not see him when he was hurt. I knew nothing about him having gotten hurt. I did not have any conversation with him, other than that, when I asked him for his ticket, and he said, 'I ain't got no ticket,' and when I asked him if he had any money, and he replied, 'I ain't got nothing,' and then I said, 'I will have to let you off at Tokio,' and he said, 'All right.' That is the only conversation that I had with him. With reference to what I saw him do from the first time that I saw him' on September 14, 1912, until the last time that I saw him, I will state that I was at the head end of the chair car and saw him alight from the train at Tokio. After alighting from the train, he walked from the train to the first panel of fence adjoining the cattle guard on the west side of the train; after reaching this panel of fence he folded his arms and leaned against the fence and was standing in that position when I last saw him."

The Pullman porter that was on the train that night testified:

"I was standing on the front end of the Pullman sleeper car when he left the train at Tokio. The sleeper car was on the back end of the train, the last car. I had been on that run two or three years. I have been working for the company a long time. I have been passing through Tokio for seven or eight years. I know the conditions there at Tokio relative to the ground and track. They have just a little shed out there, just crossroads, for a railroad station. I knew that that night. The direction toward Waco is east. The track to the southeast from the station there is usually level, little slantlike. There is a little cut on the east side. I will state that the photograph shown me represents the condition that the track was in the night of the

accident. The cattle guard was on the east side of the road, the side toward Waco is the east side, and the side toward Whitney is west side. There is just an ordinary road crossing there. The cattle guard is on the Waco side of the road crossing, the east side. That night when Charlie Rose was hurt, the Pullman car that I was on stopped on this side of the cattle guard, towards Waco. There was a little fence, the cattle guard. The fence connected with the cattle guard. There was no way that Charlie Rose could reach the station there at Tokio from where he was put off without going over the fence. If the train passed, he could go right up the track. He would pass the cattle guard in going that way. Charlie Rose was let off the train there about 10 or 12 feet on the Waco side from the cattle guard."

He also testified:

"When Mr. Holt, the conductor, came by I pointed back at Charlie Rose, and when Mr. Holt came by he did not see Charlie Rose, and I pointed back at him. I thought he was trying to beat his way. Mr. Holt went back to see if he had a ticket and he didn't have none. Mr. Holt went into the sleeper to get the tickets, and he told me to keep my eye on him, or watch him, or something, like that. When he comes back, he asked Charlie Rose for his ticket and he did not have none, and he told him [Rose], 'When you get to Tokio, you will have to get off,' and by that time we were near Tokio, so when we got to Tokio, he [Holt] says to me, 'When we get to Tokio, let him off.' Mr. Holt said that to me. He was the conductor. When we got to Tokio, I opened the vestibule, and said, 'All right,' and he got off. The spot where he got off was on the left-hand side going west. On the left-hand side."

The appellee was ejected in a cut with high embankments on either side of the track, and about 12 feet east from a cattle guard and within the right of way, which was fenced, and for appellee to reach the depot it would be necessary for him to climb the embankment and go over or through the fence or across the cattle guard into the public road, running just west of the cattle guard, leading up to the depot. The place where he was put off was not the usual and customary place for passengers to alight, and not the place where other passengers alighted that night. Appellee was found early next morning near the cattle guard with one leg so mangled that it had to be amputated between the ankle and knee, and when some parties lifted him up, a ticket entitling him to transportation over appellant's road from Waco to Aquilla dropped from his clothing.

[1] Under the facts the question arises as to whether the appellant was liable for its negligence in ejecting appellee from its train at the place it did. On a former appeal of this case from a judgment rendered in favor of appellee this court reversed and remanded the case. Tex. Cent. Ry. Co. v. Rose, 161 S. W. 387. We said:

"If the appellee at the time of his ejection from the train was mentally and physically incapacitated from being able to care for and protect himself from danger, then appellant's liability depends upon whether * * * the place where ejected was such a one as a prudent person would have considered safe under the circumstances."

[2] The court on this trial submitted to the jury special issues, among them the following:

"If Charlie Rose was on defendant's train in a state of intoxication such as rendered him mentally and physically incapable of caring for himself and of appreciating danger and understanding the nature and consequences of his acts, and if he remained in such condition until after he was injured, if he was, and if the defendant's agents in charge of the operation of said train required him to leave said train while he was in such condition, and if they knew of such condition at the time they so required him to leave said train, if they did, and if the place where they required him to leave said train, if they did, was such a place as a person of ordinary prudence would have considered unsafe to leave a person in such condition under the circumstances, and if the condition of such place was known to said agents of defendant at the time they so desired him to leave said train, if they did, then was the act, if any, of the defendant's said agents and servants in so requiring him to leave said train, if they did, at said time and place an act of negligence as that term has been defined to you?"

"If such agents of defendant required Charlie Rose to leave said train at the time and place alleged and such act was negligence, then, was such negligence the proximate cause of the injury sustained by the said Charlie Rose, if any?"

The jury found, in effect, that appellee left the train at Tokio at the request of the defendant's agents; that at that time he was mentally and physically incapacitated from intoxication to take care of himself, which was known to the railroad employés, and so remained until he was injured; that the place where ejected was unsafe, and no prudent person would have left him in such a place under the circumstances; that it was negligence and the proximate cause of the appellee's being injured, and assessed the damage at $15,000. The issue was fairly and correctly presented to the jury. There is no assignment, except attacking the insufficiency of the evidence to support the findings. We think the evidence justifies the finding of the jury that the appellant was liable.

[3] The amount of the verdict is attacked as excessive. It is large, but the jury has found that amount, the trial judge has refused to grant a new trial, thereby approving it, and we will therefore not disturb it, as there is nothing to show passion or prejudice in the jury in rendering it.

The judgment is affirmed.